UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC MINCHAK, | No. 2:20-cv-00063 KJM GGH P |
| Petitioner, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| PATRICK COVELLO, | |
| Respondent. | |

*Introduction and Summary*

Petitioner, a state prisoner proceeding through counsel, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter was referred to the United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 302(e).

Petitioner, Eric Minchak, had a post-adulthood, tragic history of deteriorating mental illness. He robbed and murdered a person at a gas station (the "murder"), and the issues in this petition center around whether petitioner was sane at the time of the crime commission. Petitioner asserts that he was denied due process in the sanity phase. Specifically, petitioner asserts by giving an instruction that was at best incomplete, and at worst, at odds with state law with respect to potential overlap between a mental illness which would qualify as a basis for insanity and the existence of a personality disorder, which in itself, would not qualify as a basis

1

for an insanity finding. He also faults his attorney for not seeking a jury instruction for a situation where a mental illness was exacerbated by the overlap between the illness and a personality disorder.

Petitioner's penultimate problem, as discussed at length below, is that in order to have an actionable overlap to warrant a different jury instruction, or to have argued the overlap at all, he would have to have rejected his own experts' testified-to conclusions that personality disorder played no role in the murder; reject the prosecution expert's opinion that mental illness did not cause the murder; but, accept the prosecution argument (and perhaps the prosecution's expert) that personality defects were inferentially on display during the murder. No evidence was presented, however, from any source, much less an expert source, that there was an exacerbating overlap between mental illness and personality disorder sufficient to cause petitioner to not be able to appreciate the difference between right and wrong. The jury would have been completely at sea on a critical expert issue if an instruction had been given regarding the potential, *in the abstract*, for an insanity causing overlap of mental illness and personality disorder. For the reasons set forth below, the California courts were not unreasonable pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") in their determinations that no actionable jury instruction error occurred, nor was counsel ineffective.

*Factual Background*

    Background of Crime

The parties do not dispute the general factual background set forth by the California Court of Appeal:

> Tammy Texiera stopped for gas on her way to church. Defendant drove into the gas station "really fast" and had a "weird" and "angry" look on his face. He got out of his car, walked to Texiera, and stabbed her to death. Defendant then dumped the contents of her purse onto the ground. A witness drove into the gas station as defendant was attacking Texiera, heard her screaming, saw defendant striking her, honked his horn, and drove off calling 911.
>
> The gas station attendant also saw the altercation and approached defendant. He asked defendant what he was doing, to which defendant responded, "I'm getting gas." The attendant ran into the

> store and locked the door, but defendant entered the store through a different door. Defendant went up to the register, threw money he took from Texiera's purse on the counter, and asked the attendant to activate the gas pump. When the attendant responded he would, defendant left. The attendant locked the door behind defendant and called 911. He did not activate the gas pump.
>
> When defendant realized the gas pump had not been activated, he pulled a hammer out of his car and returned to the store. He repeatedly hit the window until it shattered, repeatedly saying "[g]ive me my gas." The attendant told defendant to move his car and he would give him gas. As defendant returned to his car, the police arrived. Defendant was taken into custody.
>
> An investigation revealed defendant's fuel gauge was on empty and he did not have any money in his wallet. His bank account was also overdrawn.
>
> A jury found defendant guilty of first degree murder and second degree robbery, found true a felony-murder special-circumstance allegation and allegations defendant personally used a deadly weapon.

People v. Minchak, No. C082992, 2018 WL 3372508, at *1 (Cal. Ct. App. July 11, 2018).[1]

Background of Sanity Phase

After the jury found petitioner guilty of the underlying crimes, the sanity phase took place. The first sanity phase wound up as a mistrial in that the jury was unable to reach a verdict. The parties do not dispute the lengthy recitation of facts given by the California Court of Appeal Third Appellate District ("Court of Appeal") for the second trial, but petitioner delves much more into the record concerning the history of petitioner's mental illness. Because no expert at trial indicated that petitioner did not have the mental illness of schizophrenia with psychotic episodes, at least intermittently florid—the only issue was the extent to which, if any, this illness and/or belatedly inferred personality disorders played a role on the day of the murder—the undersigned sets forth here the facts as recited by the Court of Appeal which focus on the experts' causation opinions. By so doing, the undersigned does not intend to minimize the unfortunate etiology of petitioner's illness.

////

---

[1] Petitioner's trial was delayed due to initially having been found not to be competent to stand trial, but after some years (about 7 ½ years later), petitioner was found to have regained competency.

3

# A

## Defense Case

Defendant called his mother, his brother, and two expert witnesses to testify regarding his mental illness. Defendant's mother and brother detailed his history of mental illness, including episodes of delusions and various hospital visits. Defendant was diagnosed with schizophrenia in 2002 and prescribed medication. He did "fairly well" between 2002 and 2005. In early 2006, however, defendant left his home in Pennsylvania abruptly for Sacramento. His family attempted to convince him to return, but he refused.

Forensic psychiatrists Charles Scott and John Chamberlain testified defendant met the requirements for insanity. Both experts testified that defendant suffered from a mental disease or defect—schizophrenia. Specifically, Scott and Chamberlain testified that defendant had schizophrenia at the time of the murder and robbery. They further testified that, although defendant knew and understood the nature and quality of his acts at the time of the crimes, he was unable to distinguish right from wrong.

With regard to defendant's inability to distinguish right from wrong, Scott testified: "It's my opinion that because of his mental disease of schizophrenia, it made him unable to distinguish right from wrong on the day of the offense. So, again, in his mind he believed, as he had for years, that the mob was after him, his life was in danger, he was and had been fleeing from them. When he pulled into the gas station on that day and he saw Ms. Texiera, it was his delusional belief she was associated, or affiliated, or in the mob, and, therefore, this was a person who had been following him. It was the first time he actually confronted his perceived person, seen this person, so he felt it was either he was going to be killed or she had to be killed, and he believed delusionally that he was acting in self-defense."

Scott explained a personality disorder is "a chronic maladaptive way of interacting with the world. Usually begins since late adolescence or early adulthood, and typically, if they have schizophrenia or major mental illness accounting for their behaviors, you don't attribute those to a personality disorder because you clearly have a more serious mental illness driving that behavior."

Following the conclusion of his testimony, the judge presented the following question to Scott on behalf of the jury: "Can you explain the difference between a behavioral disorder, a mental disorder, and if there are other potential mental illnesses that might be less than the ones you have described that might relate to the defendant?" Scott explained a personality disorder is "someone who does not respect the rules of society, and [is] willing to break laws." He rejected the suggestion that defendant had an antisocial personality disorder or borderline personality disorder.

Chamberlain echoed Scott's testimony regarding defendant's inability to distinguish right from wrong, stating, "it's my opinion that he was incapable of distinguishing right from wrong at [the time

of the murder] based on his schizophrenia." He explained his opinion was based on the nature and sequence of the events: the murder and robbery occurred in daylight in an area where traffic and people were expected; defendant did not conceal his identity or attempt to avoid detection; defendant continued the attack when another person drove up and while making eye contact with that witness; defendant responded, "I'm just getting gas," to the attendant's question about what he was doing when the attendant clearly saw defendant had attacked Texiera; defendant attempted to pay for gas after the attendant had seen the attack; defendant broke the store's glass when the pump was not activated and did not attempt to flee; and defendant told the attendant: "Go ahead and call the police. Call the FBI. My sister's in the FBI."

Following the conclusion of his testimony, the judge presented the following question to Chamberlain on behalf of the jury: "Were there other doctors [who] made different diagnoses than schizophrenia? And what were those other diagnoses?" Chamberlain responded other diagnoses in the records included anxiety disorder, substance use disorder, and mention of defendant possessing a schizotypal personality trait. He explained a schizotypal personality trait is generally ascribed to people with "magical thinking" who are "very superstitious," but they usually are "not having hallucinations" and are "not obviously delusional." Further, "[t]hey don't have the level of impairment that someone with schizophrenia has."

Similar to Scott, Chamberlain had concerns with the "personality diagnoses": "But I think when you have—part of the problem with personality diagnoses is when you have someone who has a severe mental illness like schizophrenia, and especially schizophrenia starts so young, personality disorders can't be diagnosed until the person is 18. And when you have something like this where at—in his early twenties, he is starting to have symptoms of a very severe mental illness, I don't think you can really reliably, in most cases, go back and diagnose a personality disorder because you have to sort of consider what effects on personality this severe chronic mental illness is going to have." It was Chamberlain's opinion that, although there was mention of "psychopathic personality traits" in the records, he did not believe the testing "supported any conclusion that [defendant] really had significant traits of psychopathy."

**B**

**Prosecution Case**

The prosecution called various witnesses and one clinical and forensic psychologist, Bruce Ebert, as an expert. Ebert testified "[t]here's no question" defendant "suffers from a diagnosable mental disorder that would qualify under the insanity law" and "a very serious mental illness"—schizophrenia. He was of the opinion, however, that defendant "was capable of knowing or understanding the nature and quality of his acts" and that "defendant was capable of distinguishing right versus wrong." In this regard, when asked, "[i]n your opinion, what role did the defendant's schizophrenia play" on the day of the murder and robbery, Ebert responded, "[n]one." In

5

his opinion, schizophrenia had nothing to do with whether defendant knew the wrongfulness of his behavior.

Ebert explained he based his opinion on the store's video of the crime and the timeline he developed based on the video, which indicated there was no evidence that there was an imminent threat to defendant at the time of the murder and robbery. More specifically, he found no evidence that Texiera presented an imminent threat of harm to defendant. Ebert explained there were two explanations for defendant's actions: "Either he was desperate and he did what he had to do to get money and acted in a manner consistent in the past when he was desperate, or, secondly, he was operating under a delusion that somehow, Ms. Texiera was a member of the Mafia and was going to kill him. And yet when you look at the time line [sic], umm, I can't find any point in time where there is any imminent threat of harm to [defendant]. Even if you accept the delusion theory there's no imminent harm."

The sequence of events pointed to an act of desperation motivated by money, Ebert said, because after defendant immobilized Texiera, he reached for her purse and took the money to buy gas. Ebert believed this was consistent with defendant's "continuing pattern" that "if he gets feeling desperate, if he doesn't get what he wants, then he's going to act out violently." Ebert explained he did not believe defendant had a delusion regarding the mob because he found no evidence that the delusion was consistent and fixed over time, as one would expect. Thus, Ebert said defendant's acts were "in relationship to the dire circumstance he was in at the time, and not any fancy mental illness theory ... yeah, he was mentally ill, but, no, his mental illness didn't—didn't cause him to do this. Many other things did."

The prosecution asked Ebert about the various tests he performed on defendant. Ebert testified defendant has "some antisocial tendencies," and is narcissistic and self-focused. Defendant also scored high on the schizoid scale (meaning he generally operates in his own world mentally, which leads to peculiar types of thoughts and behavior), avoidant scale (he avoids any kind of important or long-term relationship with another human being), schizotypal scale (a personality disorder directly connected to schizophrenia leading to unusual ideas and beliefs), and paranoid personality scale (the paranoia is built into his personality structure in addition to being a component of his schizophrenia, leading him to chronically distrust everyone). He also showed elevations on the alcohol dependence scale, had "a significant score on the scale measuring a delusional disorder" (which is part of his schizophrenia), and had a "slight elevation in the antisocial scale."

Ebert said the personality traits are "fixed patterns" and when "you add a mental illness on top of that, and then couple that with antisocial attitudes, antisocial features, and, um, it just doesn't bode well for—for [defendant] to have any pleasure in his life, and it doesn't bode well for anyone around him because they could be the object of his—of his wrath or his desire." While he did not believe defendant's conduct was driven by psychopathy, he explained defendant does have tendencies of "a person who is manipulative,

6

> who has grandiose ideas, chronic interpersonal problems, and—and just the overall tendency that—that they're going to get their needs met no matter whatever adverse effect it has on others."
>
> The judge presented several questions to Ebert on the jury's behalf. The jury asked whether defendant has a personality disorder, to which Ebert responded, "[y]es." The jury further asked: "Regarding the concept of narcissism, does narcissism cause him to consciously do what he wants, or is it an instinctive or an uncontrollable impulse?" Ebert responded: "So narcissism, just like other personality traits, are not instinctive. I mean, they may be instinctive, but they certainly do not go beyond the control of the individual. Ultimately, the individual has control for—all of us individuals, all of us, have control of our behavior."
>
> Following the jury's questions, the prosecution asked what effect narcissism had on defendant. Ebert explained, "it's coupled with his mental illness. So the fact that he is narcissistic means he essentially operates in his own world and what is important to him are his needs, his desires, his goals, and essentially what he wants to accomplish in any given situation, regardless of what the needs of others are in those situations." The prosecution further asked Ebert to identify defendant's potential personality disorders. Ebert responded: "So I believe that he has a combination of a schizoid personality disorder and a schizotypal personality disorder. Those are typically the personality disorders that often lead to schizophrenia." When asked whether it was the same as schizophrenia, he responded: "No. It's different because it does not—the personality disorder is part of the character structure of the personality, and it does not have the more serious symptoms that go along with schizophrenia, such as does not have auditory or visual or gustatory hallucinations. No delusions of that sort." Ebert explained personality disorders "remain steady over a person's lifetime."
>
> The defense also responded to the jury's questions, asking: "And at this time, you are not denying that although [defendant] has personality disorders, that he has a serious mental illness, are you?" Ebert responded, "[n]ot at all" and confirmed defendant suffers from schizophrenia.

People v. Minchak, 2018 WL 3372508, at *2-4.

*Issues Presented*

Petitioner presents the following issues in his petition:

1. Instructional error violated Petitioner's federal right to due process: CALCRIM 3450 improperly prohibited the jury from considering Petitioner's personality disorder as part of his mental illness when deciding whether he was insane when he committed the charged crimes; and

7

  2. Petitioner was deprived of his Sixth and Fourteenth Amendment rights to the effective assistance of trial counsel in that counsel failed to: (1) request an instruction accurately reflecting the law (Cal. Penal Code Section 29.8.), that the jury could consider Petitioner's schizophrenia in combination with any personality disorder when deciding whether he was insane at the time of the murder and robbery; (2) argue to the jury consistent with the correct instruction, that Petitioner's schizophrenia and any personality disorder should be considered in combination in determining whether he was insane at the time of the offense.

*Discussion*

  AEDPA Standards

The statutory limitations of the power of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996. The text of § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), clearly established federal law consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 565 U.S. 34, 39 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)). Circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 63-64 (2013) (citing Parker v. Matthews, 567 U.S. 37, 48 (2012)). Nor may it be used to "determine whether a particular rule of law is so

8

1   widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court,
2   be accepted as correct. Id.

3         A state court decision is "contrary to" clearly established federal law if it applies a rule
4   contradicting a holding of the Supreme Court or reaches a result different from Supreme Court
5   precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003).
6   Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the
7   writ if the state court identifies the correct governing legal principle from the Supreme Court's
8   decisions, but unreasonably applies that principle to the facts of the prisoner's case. Lockyer v.
9   Andrade, 538 U.S. 63, 75 (2003); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  In this
10  regard, a federal habeas court "may not issue the writ simply because that court concludes in its
11  independent judgment that the relevant state-court decision applied clearly established federal law
12  erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, supra,
13  529 U.S. at 412. See also Lockyer, supra, 538 U.S. at 75 (it is "not enough that a federal habeas
14  court, 'in its independent review of the legal question,' is left with a 'firm conviction' that the
15  state court was 'erroneous.' ") "A state court's determination that a claim lacks merit precludes
16  federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state
17  court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v.
18  Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus
19  from a federal court, a state prisoner must show that the state court's ruling on the claim being
20  presented in federal court was so lacking in justification that there was an error well understood
21  and comprehended in existing law beyond any possibility for fairminded disagreement."
22  Harrington, 562 U.S. at 103.

23        The court looks to the last reasoned state court decision as the basis for the state court
24  judgment. Wilson v. Sellers, 138 S.Ct. 1188, 1192, 200 L. Ed. 2d 530 (2018). "[Section] 2254(d)
25  does not require a state court to give reasons before its decision can be deemed to have been
26  'adjudicated on the merits.' " Harrington, 562 U.S. at 100. Rather, "[w]hen a federal claim has
27  been presented to a state court and the state court has denied relief, it may be presumed that the
28  state court adjudicated the claim on the merits in the absence of any indication or state-law

9

procedural principles to the contrary." Id. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100.  Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a "federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits." Johnson v. Williams, 568 U.S. 289, 293 (2013).  When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo.  Stanley, supra, 633 F.3d at 860.

The state court need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at its decision.  Early v. Packer, 537 U.S. 3, 8 (2002). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Id. at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." Harrington, 562 U.S. at 98.  A summary denial is presumed to be a denial on the merits of the petitioner's claims. Stancle v. Clay, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Harrington, 562 U.S. at 98. This court "must determine what arguments or theories...could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.' " Id. at 101 (quoting Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) (emphasis added).  Emphasizing the stringency of this standard, which "stops short of imposing a

10

complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 102.

Application of AEDPA to the Issues Presented

1. *Defective Jury Instruction*

As set forth by the Court of Appeal, the jury instruction given in this case provided the following:

> The pertinent part of the CALCRIM No. 3450 instruction given at trial read: "The defendant must prove that it is more likely than not that he was legally insane when he committed the crime. [¶] The defendant is legally insane if: [¶] 1. When he committed the crime, he had a mental disease or defect; [¶] AND [¶] 2. Because of that disease or defect, he was incapable of knowing or understanding the nature and quality of his act or was incapable of knowing or understanding that his act was morally or legally wrong. [¶] *None of the following qualify as a mental disease or defect for purposes of an insanity defense: personality disorder*, adjustment disorder, seizure disorder, or an abnormality of personality or character made apparent only by a series of criminal or antisocial acts." (Italics added.)

People v Minchak, 2018 WL 3372508, at *5.

Petitioner, citing People v. Fields, 35 Cal. 3d 329 (1983), as well as Cal. Penal Code Section 29.8,[2] argues that California law only precludes consideration of a personality disorder as the *sole cause* of an insanity decision. Neither the undersigned, nor the Court of Appeal disagree. The Court of Appeal held, however, that the instruction given was appropriate because no evidence had been presented which would allow personality disorder to be considered whatsoever in the determination of insanity:

> Here, defendant did not present any evidence showing his alleged insanity arose out of the combination of his antisocial personality disorder and his schizophrenia, as he now claims. Rather, both his experts expressed the opinion defendant was unable to distinguish right from wrong on the day of the crimes because of his mental

---

[2] Cal. Penal Code Section 29.8, formerly Section 25.5, became effective 2013 and provided the following: "In any criminal proceeding in which a plea of not guilty by reason of insanity is entered, this defense shall not be found by the trier of fact solely on the basis of a personality or adjustment disorder, a seizure disorder, or an addiction to, or abuse of, intoxicating substances. This section shall apply only to persons who utilize this defense on or after the operative date of the section."

11

> disease of schizophrenia, and any diagnoses of personality disorders were unreliable.
>
> The prosecution's expert expressed the opinion that defendant's mental disease of schizophrenia played no role in the crimes and that defendant knew right from wrong when he took those actions. While a jury may have inferred from Ebert's testimony that defendant's personality traits and characteristics played a role in the murders and robbery, that inference does not aid defendant.1 [footnote provided below] Ebert said that defendant had schizophrenia but knew right from wrong when he committed the crimes while defendant's experts said he was unable to distinguish between right and wrong as a result of his schizophrenia. This presented a classic credibility question for the jury on which expert to believe and the jury rejected the theory advanced by defendant's experts.
>
> There were no facts or evidence before the court supporting defendant's claim that the instruction should have been clarified to allow the jury to consider his schizophrenia in combination with a personality disorder when deciding whether he was insane at the time of the murder and robbery. Indeed, both sides elicited evidence and argued the sanity issue based on schizophrenia, not defendant's personality disorder. The court had no duty to instruct on points of law not relied upon by either the prosecution or the defense and which, when placed in the context of the developments at trial, were inconsequential to a proper resolution of defendant's sanity.

People v. Minchak, 2018 WL 3372508, at *5-6.

Footnote 1 of the Court of Appeal's opinion is also important to note here:

> Defendant argues Ebert opined the crimes were "the result of [defendant's] personality disorder" and "[i]n closing argument, the prosecutor relied heavily on Dr. Ebert's testimony and the results of psychological tests that Dr. Ebert administered to argue that [defendant's] crimes were the result of his antisocial personality, not his paranoid delusions." We find no support for these claims from either defendant's record citations or our independent review of the record.

Id., at *5 n.1.

Importantly, petitioner herein does not take issue with the factual recitation of the Court of Appeal, petitioner simply argues that the jury should have been able to consider personality

////

////

////

disorder along with schizophrenia to determine whether petitioner knew right from wrong at the time of the crime's commission.³

Petitioner is incorrect on several counts. First, as set forth in the introduction, petitioner's experts testified that personality disorder played no part in the insanity analysis. In hindsight, petitioner's present counsel says this is of no moment; he seizes upon the fact that the prosecution expert testified that petitioner did have a personality disorder, but ignores the fact that the prosecution expert testified that mental illness did not preclude petitioner from understanding right from wrong. Most importantly, with a "correct" jury instruction in the abstract, petitioner would have required the jury to figure out *on its own* the causative interrelationship, if any, between the personality disorder and mental illness with respect to petitioner's understanding of right from wrong without *any* expert explanation of the degree of interrelationship necessary. Perhaps, if petitioner's experts were correct, the schizophrenia superseded any personality disorder otherwise affecting petitioner. Perhaps, the two concepts of illness and disease have no interrelating effect with the ability to know right from wrong. While it is *possible* that mental illness combined with personality disorder has a sufficient exacerbating effect on the understanding right from wrong analysis, jury instructions cannot be given to a jury requiring them to speculate on matters of medical causative expertise—hard expert evidence is necessary. Put another way, it is not simply the fact that the jury might have been able to resolve from the evidence whether petitioner had both a personality disorder along with schizophrenia, *but it was critical what that meant in the understanding right from wrong analysis.* The "correct" jury instruction proffered by petitioner would require such speculation.

The Court of Appeal found that such evidence was lacking for the jury to decide the causative effect—hence the jury instruction given, whether correct or incorrect in the abstract, was not defective given the evidence presented. Whether one views this determination that the

////

---

³ "Petitioner's claim is simply that the pattern CALCRIM instruction was an incorrect statement of the law […] Petitioner did not need to present evidence that his insanity arose out of the combination of his schizophrenia and any personality disorder. The prosecution presented evidence of a personality disorder and Petitioner presented undisputed evidence of schizophrenia. The jury, therefore, heard evidence that he suffered from both." ECF No. 18 at 5-6 (Traverse).

13

1    instruction was correct given the circumstances, or not harmful in any material sense if an

2    incorrect instruction under the governing law (really the flip side of the same issue), it cannot be

3    said that the Court of Appeal's decision was so unreasonable that fair jurists would not have come

4    to that conclusion.

5        Thus, it is not necessary to discuss at length the law regarding legally incorrect jury

6    instructions.  See Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (the incorrectness of an

7    instruction must "infect" the outcome of the trial).  Again, either the instruction was correct given

8    the evidentiary circumstances, in which case no discussion is necessary, or it was legally harmless

9    in material respect.  The latter scenario is governed by Brecht v. Abrahamson, 507 U.S. 619

10   (1993), i.e., the harm must have had a substantial and injurious effect on the verdict as viewed

11   through the AEDPA unreasonableness prism. [4] The Court of Appeal was AEDPA correct in either

12   case.

13       2.   *Ineffective Assistance of Counsel*

14       Petitioner asserts his counsel was ineffective because he did not seek to have a jury

15   instruction given which would have allowed the jury to consider petitioner's personality

16   disorders, i.e., he should have sought an instruction in conformance with the law that  personality

---

[4] On federal habeas review of state court findings of constitutional error, the harmless error standard of Brecht v. Abrahamson, 507 U.S. 619 (1993), applies. The question is whether the error had substantial and injurious effect or influence in determining the jury's verdict and resulted in "actual prejudice." See Brecht, 507 U.S. at 637; Fry v. Pliler, 551 U.S. 112, 120 (2007). Because the Brecht standard "obviously subsumes" the more liberal AEDPA/Chapman standard, the Ninth Circuit has held "we need not conduct an analysis under AEDPA of whether the state court's harmlessness determination on direct review...was contrary to or an unreasonable application of clearly established federal law." Pulido v. Chrones, 629 F.3d 1007, 1012 (9th Cir. 2010) (citing Fry, 551 U.S. at 120). See also Ortiz v. Yates, 704 F.3d 1026, 1038; n. 9 (9th Cir. 2012). Instead, a federal habeas court is to apply the Brecht test without regard for the state court's harmlessness determination. Pulido, 629 F.3d at 1012 (citing Fry, 551 U.S. at 121–22); see also Merolillo v. Yates, 663 F.3d 444, 454–55 (9th Cir. 2011) (Applying " 'the Brecht test without regard for the state court's harmlessness determination.' ")

    The Supreme Court has since clarified that Brecht incorporates the requirements of § 2254(d) (AEDPA). Davis v. Ayala, 135 S. Ct. 2187, 2199 (2015). Accordingly, if a state court has determined that a trial error was harmless, "a federal court may not award habeas relief under § 2254(d) unless the harmlessness determination itself was unreasonable." Id. (quoting Fry, 551 U.S. at 119) (emphasis in original). "[R]elief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict.' " Davis, 135 S. Ct. at 2197–98 (quoting O'Neal v. McAninch, 513 U.S. 432, 436, 115 S.Ct. 992 (1995)). The Brecht test will be applied, but with due consideration of the state court's reasons for concluding the error was harmless beyond a reasonable doubt. Jones v. Harrington, 829 F.3d 1128, 1141-42 (9th Cir. 2016).

disorders could not be considered as the "sole" basis for insanity, but (inferentially) could be considered for their additive effect to a mental illness.

The ineffective assistance claim was not decided by the Court of Appeal. It was raised by petitioner in a state habeas petition with the California Supreme Court prior to filing the federal petition and decided by the California Supreme Court with a silent denial during the pendency of this case. See ECF Nos. 17-19, 17-20. Thus, the issue is exhausted, and subject to the AEDPA standards set forth below.

Clearly established federal law for ineffective assistance of counsel claims Strickland v. Washington, 466 U.S. 668 (1984). To succeed on a Strickland claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." Id. at 687. Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." Id. at 687–88 (internal quotation marks omitted). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' " Harrington, supra, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 687). A reviewing court is required to make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 669. Reviewing courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. There is in addition a strong presumption that counsel "exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689). This presumption of reasonableness means that the court must "give the attorneys the benefit of the doubt," and must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did." Cullen v. Pinholster, 563 U.S. 170, 198 (2011) (internal quotation marks and alterations omitted).

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. A

reviewing court must "examine the reasonableness of counsel's conduct 'as of the time of counsel's conduct.'" United States v. Chambers, 918 F.2d 1455, 1461 (9th Cir. 1990) (quoting Strickland, 466 U.S. at 690). See also Rhoades v. Henry, 638 F.3d 1027, 1036 (9th Cir. 2011) (counsel did not render ineffective assistance in failing to investigate or raise an argument on appeal where "neither would have gone anywhere"). Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. "The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 112. Under AEDPA, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Id. at 101. "[B]ecause the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009).

In support for his claim, petitioner asserts:

> Petitioner simply alleges that counsel was ineffective for not pointing out to the court that the pattern instruction was not an accurate reflection of the law. Respondent acts as if such a request is akin to requesting a pinpoint instruction; it is not. Counsel has an obligation to know the law and make sure that the jury instructions accurately reflect the law. *Petitioner is not suggesting that counsel should have chosen a different defense or a different theory.* A misstatement of the law took a legal right away from Petitioner. Counsel had nothing to lose and could only have helped his client by ensuring that the jury at least heard the correct law as to what could be considered in evaluating Petitioner's sanity. Had counsel investigated and known the law he would likely only to have asked the judge to modify the instruction to more accurately track the language of [t]he statute.

ECF No. 18 at 6 (emphasis added).

The problem with petitioner's "simple" assertion is that jury instructions are not given in a vacuum. Rather, jury instructions are given because evidence exists which supports the manner in which they are framed. Moreover, reasonable counsel does not throw out a "Hail Mary" jury instruction seeking the jury speculate about its effect in the absence of evidence. Rather, reasonable counsel argues why the evidence *presented in court* supports the defense theory within the context of the instruction.

16

Here, if the requested jury instruction were to have been given, defense counsel would have had to tell the jury to reject the opinions of his own experts that personality disorder did not play a role in the murder, even if it existed at all. Counsel would have had to urge the jury to accept the testimony of the prosecution expert that petitioner did have a personality disorder (but not that part of the testimony which related that petitioner's mental illness did not play a role in the murder). Then the argument would continue to the jury that although there is no expert testimony concerning the causative effect of the combined mental illness/personality disorder (assuming that they could be combined in petitioner's case)—you can decide, i.e., speculate upon, this critical medical expert issue for yourselves.

Petitioner might say that no such argument was necessary; that the instruction stating that personality disorder could not be the *sole* basis for a finding of insanity could just have been presented in silence to the jury for their unguided use for whatever purpose. The undersigned disagrees, but even if the undersigned was erroneous, the issue would then be what would the jury probably have done in this unguided situation. At this point, an outcome favorable to petitioner would be completely speculative—hardly the prejudice required by Strickland, much less a reason to find that the California Supreme Court was unreasonable in its rejection of petitioner's state habeas petition. The events leading to petitioner's conviction were fatal for the hapless, random victim and tragic for petitioner. Nevertheless, there is no reason in the law to grant this habeas petition. Accordingly, the undersigned recommends the habeas petition be denied.

*Conclusion*

Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate of appealability may issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For the reasons set forth in these findings and recommendations, a substantial showing of the denial of a constitutional right has not been made in this case.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. The petition should be denied on its merits and dismissed; and

    2. The District Court decline to issue a certificate of appealability.

    These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: June 23, 2020

/s/ Gregory G. Hollows
UNITED STATES MAGISTRATE JUDGE